UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KEVIN R. GEMEREK,

                              Plaintiff,

        v.                                                          **DECISION AND ORDER**
                                                                    99-CV-0879S

BUFFALO SEWER AUTHORITY
  and
ANTHONY HAZZAN,

                              Defendants.

## I.  INTRODUCTION

Plaintiff Kevin R. Gemerek commenced this employment discrimination action by filing a Complaint in the United States District Court for the Western District of New York. (Docket No. 1.)  He subsequently filed an Amended and Second Amended Complaint. (Docket Nos. 19, 75.)  The Second Amended Complaint alleges that Defendant Buffalo Sewer Authority ("BSA") violated Gemerek's First Amendment rights, and that BSA and its general manager, Anthony Hazzan, discriminated against him and subjected him to a hostile work environment.

Gemerek brings this action pursuant to Section 1983 of the Civil Rights Act of 1964, 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., (hereinafter, "ADA"); the New York State Human Rights Law, N.Y. EXEC. L. §§ 296 et seq. (hereinafter, "NYHRL"); and, New York Labor Law § 201-d.

Presently before this Court is Defendants' Motion for Summary Judgment (Docket

No. 119), seeking dismissal of the Complaint in its entirety.[1]  Gemerek opposes the

motion.[2]  For the reasons stated below, Defendants' motion is granted in part and denied

in part.

## II.  BACKGROUND

**A.    Facts**

Plaintiff Kevin R. Gemerek commenced employment at BSA in February 1981 as

a Wastewater Operator I.  (Docket No. 119, p. 50.)  In June 1993, he was promoted to

Shift Superintendent.  (Id.)  After Gemerek's Shift Superintendent position was eliminated

in a May 1996 workforce restructuring, he accepted a temporary Assistant Shift

Superintendent position where he remained until his termination on November 8, 1996.

(Defs.' Stmt.[3] ¶ 1; Docket No. 119-5, p. 50.)  At all relevant times, Gemerek was a member

of the Civil Service Employees Association Inc., Local 1000, AFSCME, AFL-CIO ("CSEA"

or "union").  (Defs.' Stmt. ¶ 2.)  CSEA is recognized as the exclusive bargaining unit for

some of BSA's employees, including Gemerek.  (Id. ¶ 3.)

Defendant Anthony Hazzan commenced employment with BSA in March 1994 as

Secretary to the General Manager.  (Docket No. 131-3, 11:20-25.)  He became acting

General Manager in or around July 1995, and was appointed to General Manager in 1998.

(Id. 13:22-24, 14:2-4, 13-17.)  As acting General Manager, Hazzan was responsible for

---

[1]In support of their Motion for Summary Judgment, Defendants filed a Declaration of Randolph C. Oppenheimer, Esq.; Rule 56.1 Statement of Undisputed Material Facts, with Appendix; Memorandum of Law; Reply Memorandum of Law; Supplemental Declaration of Randolph C. Oppenheimer, Esq.; Supplemental Rule 56.1 Statement , with Appendix; and Supplemental Memorandum of Law.

[2]In opposition to Defendants' motion, Gemerek filed a Memorandum of Law; Rule 56.1 Statement of Disputed Facts, with Appendix; and Declaration of Beverley S. Braun, Esq., with Appendix and Exhibits.

[3]Referring to "Defendants' Rule 56.1 Statement of Undisputed Material Facts."

making decisions about restructuring.  (Id. at 13:7-9.)

BSA's Restructuring

In 1994, BSA began planning to restructure its personnel in order to run more efficiently.  (Id. at 19:15-19. )  As part of the restructuring plan, in or about July 1995, BSA eliminated overtime that Shift Superintendents traditionally had been allowed to work.  (Docket No. 84-5, pp. 5-6.)  On August 11, 1995, CSEA filed a grievance alleging that BSA violated the Collective Bargaining Agreement (hereinafter, "CBA") by having Assistant Shift Superintendents do the work of Shift Superintendents.  (Docket No. 85-5, p. 59.)  On August 14, 1995, CSEA filed an improper practice charge with the New York State Public Employment Relations Board ("PERB"), alleging BSA violated the Public Employees' Fair Employment Act when it shifted overtime work from Shift Superintendents to Assistant Shift Superintendents.  (Docket No. 85-5, p. 57.)

In May 1996, BSA determined that it could operate with five Shift Superintendents rather than eight. (Docket No. 84-5, pp. 2-3.)  The three least senior Shift Superintendents, including Gemerek, were impacted.  (Id. at p. 3.)  Two of the affected employees were "bumped" to vacant assistant positions.  (Id.)  Gemerek, having the least seniority, was laid off.  (Id. at p. 10.)  However, a temporary Assistant Shift Superintendent position became available later that same month, and Gemerek was offered and accepted the position.  (Id.)  On August 28, 1996, CSEA filed an improper practice charge relative to the elimination of positions, which charge was later amended to include Gemerek's termination.  (Id. at 61-66.)  Some of the facts set forth herein are drawn from the testimony at the PERB hearing and findings of the PERB Administrative Law Judge ("ALJ").  (Id. at 32-52.)

3

Plaintiff's Absence from Work and Failure to Provide Doctor's Note

Throughout the time period at issue here, Gemerek was treated for depression.  In 1995, Gemerek was off work due to a back injury.  (Docket No. 119-5, p. 51.)  On or about November 6, 1995, BSA received a letter from Dr. Ring, the orthopedic surgeon who examined Gemerek for his injury, noting that Plaintiff was "very depressed," was on anti-depressants, and had been on Prozac for 1-1/2 years.  (Docket No. 131-11 at 2.)  Dr. Ring felt Gemerek's "psychiatric problems [were] a definite factor in his recovery" from the injury. (Id.)

After recovering from his back injury, Gemerek returned to work for a short period of time.  (Docket No. 119-5 at 52.)  BSA did not take any action to determine Gemerek's psychological condition prior to his return to work. (Id. at 51.)  Gemerek failed to report to work as scheduled on June 21, 1996.  (Id. at 52.)  From June 26, 1996 to July 1, 1996, he was confined at Bry-Lin Psychiatric Hospital for "Acute crisis stabilization" after he presented as overtly depressed.  (Id. at p. 60-61.)  Gemerek also was treated for addiction to codeine, which he had begun taking because of his back problems.  (Id. at 60.)  He stabilized without difficulty, was discharged with a diagnosis of Major Depression, Recurrent Without Psychotic Features, and was prescribed Xanax and Prozac, along with Darvocet-N for pain.  (Id. at 61.)  He followed up with Dr. Kang, who had treated him during his hospitalization.  (Id. at 60-61.)  Gemerek testified before the PERB ALJ that he called in to work sick on a daily basis, but did not tell anyone why he was absent or the nature of his illness.  (Docket No. 85-4 at 42.)

When Sal LoTempio, assistant treatment plant superintendent, advised Director of Employee Relations, Pamela DiPalma, that Gemerek was off work, she wrote a letter,

dated July 1, 1996, advising Gemerek of the need to report to her and present a doctor's note.  (Docket Nos. 85-4 at 36, 42; 119-5 at 2.)  DiPalma had BSA employee Angelo Provenzano hand-deliver the letter to Gemerek's residence. (Docket No. 85-4 at 42.) Gemerek testified that Provenzano made a scene when he dropped off the letter, screaming "does Kevin Gemerek live here."  (Pl. Dep. 213:3-7.)  This incident was so upsetting to Gemerek that he consulted his therapist, Dr. Kang.  (Id. 163:19.)

Sometime thereafter, LoTempio informed DiPalma that he had been in contact with Gemerek, and that Gemerek would be returning to work on July 21, 2006.  DiPalma again wrote to Gemerek, on July 16, 1996, directing that he appear at her office on July 18, 1996 at 2:00 p.m., with a note from his doctor "stating that [Gemerek] may return to work with no restrictions or limitations."  (Docket No. 119-5 at 6.)  Since at least January 1996, BSA has required that an employee returning to work from an extended illness meet with DiPalma in advance, and provide written authorization to return to work from his or her physician. (Id. at 30.) BSA employee Dennis Faye hand-delivered DiPalma's second letter to Gemerek's house, dropping it in his mailbox.  (Docket No. 85-4 at 42.)

Gemerek arrived for the scheduled meeting with a note from Dr. Kang, dated July 9, 1996, certifying he was able to "return to work on 07-14-96, with no restrictions."  (Id. at 43; Docket No. 119-5 at 43.)  However, DiPalma was unable to meet with Gemerek due to a family emergency.  (Docket No. 85-4 at 43.)  Gemerek testified that he became loud and angry when he discovered DiPalma was not there to meet with him, and concedes he told Faye he had reported Faye to the Postmaster General for placing the July 16 letter in his mailbox.  (Id.)

DiPalma thereafter called Gemerek to ask him who Dr. Kang was and what he was

being treated for, but Gemerek declined to provide that information.  (Id. at 43-44.)

DiPalma testified at the PERB hearing that she believed she had a right under the contract

to inquire about the nature of Gemerek's illness, citing Article IX, Section 1(h) of the

collective bargaining agreement between BSA and CSEA for the period July 1, 1995 - June

30, 1998.  (Id. at 44.)  That provision states, in pertinent part, that:

> "Prior to receiving sick pay under this provision, an employee
> must execute and file... written proof of his illness or disability
> during the period of his absence.  Said proof... shall include a
> physician's certificate specifically setting forth the exact nature
> of the employee's illness or disability..."

(Docket No. 119-5 at 24).  This provision does not relate to an employee's return to work.

Rather, it sets forth the requirements an employee must meet to have his or her absence

charged against accumulated sick leave credits.  (Id.)

Union Demonstration

One day after Gemerek had been scheduled to meet with DiPalma, on July 19,

1996, he attended a union demonstration in front of Buffalo City Hall.  (Docket No. 85-4 at

44-45.)  Gemerek's union, CSEA, was not involved in the picketing.  (Docket No. 119-5 at

53.)  Gemerek spotted Hazzan and DiPalma leaving City Hall, grabbed a bull horn, and

started yelling at them.  (Docket No. 85-4 at 44-45.)  Accounts differ as to what Gemerek

said.  Hazzan testified before the ALJ that Gemerek stated:

> "I'm going to get you, f- - - head. Here I am, come and get
> me."  (Id. at 45.)

DiPalma testified Gemerek shouted:

> "Hazzan and DiPalma, you mother f- - - ers want me, come
> and get me.  I'm out here.  You send political cronies to my
> house.  You f- - -ing people, if you want me, come and get me.
> You harass my family."  (Id.)

6

Gemerek testified that he yelled:

> "Hi Pam. Hi Tony. I'm over here. You want to threaten my family, come over here and do it on camera."  (Id.)

Patricia DeBenedetti, an employee in DiPalma's office, heard Gemerek's remarks and wrote them down. (Id.)  Her account was substantially similar to what DiPalma recalled Gemerek saying.  (Id.)

<u>Psychiatric Evaluation and Termination</u>

After Gemerek declined to discuss the nature of his illness with DiPalma, she looked in a phone directory and discovered that Dr. Kang was a psychiatrist.  (Id. at 44.)  On July 22, 1996, Hazzan advised Gemerek, by hand-delivered letter, that BSA was in the process of scheduling a psychiatric evaluation for him, that he was not to return to work, and that he would continue to use his personal sick leave time.  (Docket No. 119-5 at 45.)  In a further letter, dated July 29, 1996, Hazzan notified Gemerek that he was placed "on leave for ordinary disability as of July 14, 1996" due to concerns regarding Gemerek's "present ability to return to [his] regular duties," and noting that in accordance with Civil Service Law, he was permitted to draw on all accumulated leave allowances standing to his credit.  (Id. at 47-48.)

Brian S. Joseph, M.D., F.A.P.A., was selected to serve as the examining medical officer.  In a letter to Dr. Joseph dated September 19, 1996, Hazzan pointed to Gemerek's past treatment for a psychological condition, his anger at finding he could not meet with DiPalma on July 18, his actions at the union demonstration on July 19, his refusal to accept a letter hand-delivered by Faye during that same time period, and his allegedly disruptive behavior at a training in the winter of 1996 (a time period after the date of Hazzan's letter).

Hazzan also recounted a conversation between Gemerek and DiPalma a year earlier, in the fall of 1995, where Gemerek commented that he was going to his ex-wife's house to shoot her boyfriend.  He went on to express concern that Gemerek could become violent in the workplace.  (Id. at 50-53.)  Hazzan requested that Dr. Joseph address, *inter alia*, whether Gemerek then had a psychological condition and, if so, explain its symptoms, and consider whether Gemerek was capable of safely performing his job.  (Id. at 54.)

In a letter dated October 24, 1996, Dr. Joseph stated that during Gemerek's mental status exam, he was "calm, appropriate and in good contact.  He was lucid and emotionally reactive, with no evidence of psychosis or impaired cognition.  He was [sic] no suicidal ideation, and his insight and judgment seemed intact."  (Id. at 59.)  After noting BSA's concern about possible workplace violence, Dr. Joseph opined that while Gemerek did have very significant, serious stressors in the past involving work, family, and financial matters, his hospitalization appeared to have stabilized the situation and "he does not have evidence of a major mental illness, as such."  (Id. at 61-62.)  Dr. Joseph found no indication that Gemerek had been overtly violent over the years, or any indication of current substance abuse or violent fantasies, and concluded that Gemerek could return to work.  (Id. at 62.)  He went on to note that Gemerek could be "difficult," but that only a return to work would reveal if Gemerek can act appropriately, and that a failure to do so  might call for administrative discipline.  (Id. at 62.)  Thus, Gemerek was cleared to return to work the week of October 27, 1996.

BSA placed Gemerek on a paid leave of absence as of October 28, 1996, and terminated him on November 8, 1996.  (Docket Nos. 85-4 at 46; 119-5 at 64.)  Hazzan testified before the ALJ that he had made the decision to terminate Gemerek and that:

8

Basically it was a series of incidents which we construed as inappropriate behaviour.  And I didn't feel that this individual — after looking at incident after incident, that this individual had the responsibility to run our waste water treatment facility.

(Docket No. 85-4 at 46.)

## B.    Procedural History

On August 28, 1996, CSEA filed an improper practice charge, later amended, alleging that the BSA violated §§ 209-a.1(a) and (c) of the Public Employees' Fair Employment Act[4] when it eliminated positions within the BSA, demoted Gemerek and two other employees, and terminated Gemerek in retaliation for filing an improper practice charge on August 11, 1995 and a grievance on August 14, 1995.  (Defs.' Ex. B, D, E.)

On July 15, 1998, after conducting a hearing over several days, the ALJ dismissed the charge in its entirety, finding that BSA did not eliminate positions or terminate Gemerek based on protected union activity.  (Docket No. 85-4, p. 48.)  The ALJ determined that BSA's decision to eliminate Shift Superintendent positions was discussed as early as 1992, and Hazzan had begun the process of eliminating the positions five months before CSEA filed the grievance and improper practice charge.  (Id. p. 19.)  Further, that BSA's rationale for terminating Gemerek, as testified to by DiPalma and Hazzan, provided sufficient basis to conclude his termination was for cause.  (Id. at p. 51.)        CSEA filed exceptions to the ALJ's decision.  (Docket No. 85-4, pp. 54-59.)  On December 10, 1998, PERB denied CSEA's exceptions and affirmed the ALJ's decision.  (Id.)

---

[4] §§ 209.a-1 (a) and (c) state that it is improper practice for a public employer to deliberately interfere with, restrain or coerce public employees in the exercise of their right of organization, and to discriminate against any employee for the purpose of encouraging or discouraging membership in, or participation in the activities of, any employee organization.  N.Y. Civ. Serv. § 209-a.1 (a), (c).

Gemerek, *pro se*, filed his Complaint with the Clerk of the Court on November 4, 1999.  (Docket No. 1.)  He filed a Motion for Appointment of Counsel on that same date. (Docket No. 3.)  After being represented by a number of consecutive attorneys, Attorney Beverley Suzanne Braun submitted a notice of appearance on March 31, 2009 and has remained as counsel.    (Docket No. 107.)   The case was originally assigned to Senior Judge John T. Elfvin, and was reassigned to Chief Judge William M. Skretny following Judge Elfvin's retirement.  (Docket No. 69.)

Defendants filed a Motion to Dismiss on March 3, 2000.  (Docket No. 8.)  On May 23, 2001, Defendants' motion to dismiss was denied as to Gemerek's NYHRL claim against Hazzan, but granted as to Gemerek's claim for punitive damages. (Docket No. 20.)

Gemerek filed an Amended Complaint on December 20, 2000 and a Second Amended Complaint on April 17, 2008.  (Docket Nos. 19, 75.) Defendants filed an Answer thereto on May 16, 2008.   (Docket No. 78.)   Defendants filed a Motion for Summary Judgment on November 10, 2008 (Docket No. 85) and Supplemental Motion for Summary Judgment on July 15, 2009 (Docket No. 119).

## III.  DISCUSSION AND ANALYSIS

**A.      Preclusive Effect of Administrative Determination**

Defendants argue that PERB's findings and determination preclude litigation of Gemerek's current claims.  (Defs.' Memo., p. 21.)  Gemerek contends his claims are not precluded because they involve issues not necessarily decided by PERB.  (Pl.'s Memo, p. 3.)

"When a state agency 'acting in a judicial capacity. . . resolves disputed issues of

fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." Univ. of Tennessee v. Elliott, 478 U.S. 788, 799, 106 S.Ct. 3220, 3226 (1986) (quoting Utah Constr. & Mining Co., 384 U.S. 294, 422, 86 S.Ct. 1545, 1560 (1966)).   It is well established that "PERB acts in a quasi-judicial capacity," given it's power to conduct hearings in which it administers oaths, examines witnesses and documents, takes testimony, receives evidence, and issues subpoenas. Scott v. Goodman, 961 F.Supp. 424, 432 (E.D.N.Y. 1997); N.Y. Civ. Serv. § 205(5)(k); O'Connor v. Mazzulo, 536 F.Supp. 641, 643 (S.D.N.Y. 1982); Perry v. Metro. Suburban Bus Auth., 390 F.Supp.2d 251, 265 (E.D.N.Y. 2005.)

"Under New York law, a state agency determination is given preclusive effect in a subsequent state court proceeding only when, *inter alia*, the identical issue has been decided in the prior action." Leventhal v. Knapek, 266 F.3d 64, 72 (2nd Cir. 2001) (internal quotation marks and citations omitted).  An issue is decided when it was "actually decided" by the administrative agency and "necessary to support a valid and final judgment on the merits." Beechwood v. Leeds, 436 F.3d 147, 153 (2nd Cir. 2006).  As the party asserting issue preclusion, Defendants have the burden of showing the identical issue was necessarily decided in a previous case.  Kaufman, 65 N.Y.2d at 456.

Furthermore, the New York Court of Appeals has set out factors to guide the court in determining whether the first action or proceeding genuinely provided a full and fair opportunity to contest the decision.  Ryan, 62 N.Y.2d at 501.  They include:

> the nature of the forum and the importance of the claim in the
> prior litigation, the incentive and initiative to litigate and the
> actual extent of litigation, the competence and expertise of

11

counsel, the availability of new evidence, the differences in the
applicable law and foreseeability of future litigation.

Id. (citations omitted).  "[T]he fundamental inquiry is whether relitigation should be permitted in a particular case in light of what are often competing policy considerations, including fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results."   Straatsburg Water Co. v. Straatsburg Fire Dist., 72 N.Y.2d 147, 153, 531 N.Y.S.2d 876, 527 N.E.2d 754 (1988).

### 1.     Section 1983 Claim

In Elliott, the Supreme Court specifically held that agency determinations with regard to § 1983 claims may be given preclusive effect in federal court where they would be entitled to the same in the State's courts.  478 U.S. at 799, 106 S.Ct. 3220.

Thus, Gemerek's § 1983 claim will be subject to preclusion if all factors considered by the courts of New York State are met.

Gemerek asserts that Defendants demoted him in 1995 and terminated him in 1996 because he engaged in activities protected by the First Amendment.  Specifically, Gemerek alleges that Defendants retaliated against him for: (1) protesting at a rally, (2) writing a letter to the Buffalo Common Council, and (3) writing a letter to Congressman Jack Quinn. (Pl.'s Memo. pp. 6-7.)

Defendants contend that the common issue in both the PERB proceeding and the instant case is the motivation behind BSA's actions against Gemerek. (Defs.' Reply, p. 1.)[5] They argue that because the ALJ found Gemerek was terminated for a legitimate business reason—i.e., for cause—the issue of BSA's motive has been decided and should not be

---

[5]Referring to "Defendants' Reply Memorandum of Law."

relitigated.  (Defs.' Memo., p. 22.)

Defendants cite two cases in support of their argument.  In <u>Perry v. Metropolitan</u> <u>Suburban Bus Auth.</u>, the plaintiff filed an improper practice charge against the union, alleging it breached its duty of fair representation in violation of the Public Employees' Fair Employment Act § 209-a.2(c).  390 F.Supp.2d 251, 265 (E.D.N.Y. 2005).  A hearing was held before an ALJ, after which the ALJ found that the plaintiff introduced no evidence of discrimination or improper motivation toward her on the part of the union, and that the union was not arbitrary in the handling of its grievance.  <u>Id.</u> at 256-57.  The plaintiff then filed in federal district court alleging, among other things, that the union violated her due process and equal protection rights on the basis of race.  <u>Id.</u> at 251.  The Court reviewed the relevant facts from the PERB hearing and held that even though the constitutionality of the Union's conduct was not before the PERB, "a determination of [the union's] motivation and intent were necessary and crucial to PERB's conclusion that the Act was not violated, and the same factual findings [were] central to the plaintiff's due process and equal protection claims."  <u>Id.</u> at 266.  Thus, the Court applied the principle of collateral estoppel to bar relitigation.  <u>Id.</u>

In <u>O'Connor v. Mazzullo</u>, the plaintiff brought an improper practice charge before PERB on the basis of anti-union bias. 536 F.Supp.641, 643 (D.C.N.Y. 1982).  After a five-day hearing, the ALJ found the defendants were not motivated by anti-union bias.  <u>Id.</u>  The plaintiff then brought a claim of first amendment violation based on anti-union motivation before the federal district court.  <u>Id.</u>  The Court found that all facts relevant to the defendant's motivation were necessary to the PERB determination because the "issue was whether defendants had acted in order to interfere with or penalize the exercise of the right

to support union activity." Id.

The cases Defendants rely on are distinguishable from the case at hand. In this case, although the ALJ found BSA's actions to be supported by legitimate business concerns, the ALJ was not asked to consider whether Gemerek's termination was motivated, in whole or in part, by his public statements or his letters to public officials.

In order for an issue to be precluded, it must have been necessary to the PERB proceeding. Shelter Inc. Realty v. City of New York, 2007 WL 29380 at * 7 (E.D.N.Y. 2007) (collecting cases). The question before the ALJ was whether the BSA violated § 209-a.1(a) of the Public Employees' Fair Employment Act by terminating Gemerek in retaliation for the CSEA's having filed an improper practice charge and a contract grievance relative to the elimination of positions.

As Gemerek points out, the ALJ's determination still stands even if the discussion of legitimate business reason is removed from the decision. In finding BSA did not violate the Act, the ALJ pointed to Gemerek's admission that he had nothing to do with the improper practice charge and the absence of any evidence linking him to the grievance. Once the ALJ concluded there was no evidence to support the alleged violations, further discussion of motivation was superfluous. See Beechwood v. Leeds, 436 F.3d 147, 151-52 (2nd Cir. 2006) (the ALJ's discussion of improper motive was not "necessary" because although it may have influenced the ALJ's findings, it was not decisive of the ultimate question concerning plaintiff's quality of resident care).

Moreover, "a plaintiff can prove First Amendment retaliation even if the measures taken by the state were otherwise justified." Beechwood, 436 F.3d at 152; see Morey v. Somers Cent. School Dist., 2007 WL 867203 at *6 (S.D.N.Y. 2007) ("Contrary to

14

defendants' arguments, plaintiff's claim for First Amendment retaliation is not precluded merely because the hearing officer decided that the School District had sufficient cause to terminate plaintiff."); see also, Latino Officers Ass'n. v. City of New York, 253 F.Supp.2d 771, 785-86 (S.D.N.Y. 2003) ("A necessary element of this claim is that the 'defendants' conduct was motivated by or substantially caused by [plaintiff's] exercise of free speech.'"). The ALJ's conclusion that Hazzan's stated rationale was sufficient to infer Gemerek was terminated for cause, does not warrant a finding that the ALJ "'actually and necessarily' decided an issue that was never presented to [her], even if that issue touched, in a general sense, on the propriety of the termination." Vargas v. City of New York, 337 F.2d 200, 206 (2nd Cir. 2004).

The issue of whether Gemerek was demoted and terminated in retaliation for exercising his First Amendment rights was not actually litigated and necessarily decided in the PERB proceeding.  Thus, there is no identity of issues and Gemerek is not precluded from bringing his § 1983 claim in this forum.

## 2. ADA Claims

The Supreme Court has specifically held that state administrative proceedings do not have preclusive effect with regard to Title VII claims, Elliott, 478 U.S. at 795-6, and ADEA claims, Astoria Fed. Sav. & Loan Ass'n v Solomino, 501 U.S. 104, 110-112, 111 S.Ct. 2166, 115 L.Ed. 96 (1991).  Although the Supreme Court has not had an opportunity to address this issue with regard to the ADA, I note that the ADA incorporates the very same Title VII deferral procedures on which the Supreme Court relied in reaching its holding in Elliot.  See 42 U.S.C. § 12117 (incorporating 42 U.S.C. § 2000-e).  Circuit Courts

considering this issue have concluded that the <u>Elliot</u> holding applies with equal force in the ADA context, and unreviewed state administrative determinations do not preclude subsequent federal court litigation of ADA claims. <u>Thomas v. Contoocook Valley Sch. Dist.</u>, 150 F.3d 31, 40 n.5 (1st Cir. 1998); <u>Medeiros v. City of San Jose</u>, No. 98-16530, 1999 WL 613405, at * 1 (9th Cir. Aug. 12, 1999); *see also*, <u>Kosakow v. New Rochelle Radiology</u>, 274 F.3d 706, 735 (2nd Cir. 2001) (noting, in *dicta*, that to the extent plaintiff's discrimination claims were based on the ADA, the state administrative determination would have no effect on subsequent federal litigation). Other district courts in the Circuit have held likewise, and this Court agrees. *See, e.g.*, <u>Lomako v. New York Inst. of Tech.</u>, 09 Civ. 6066, 2010 U.S. Dist. LEXIS 46549, at *20-21 (S.D.N.Y. May 12, 2010); <u>Greenberg v. New York City Transit Auth.</u>, 336 F.Supp.2d 225, 242 (E.D.N.Y. 2004).

Thus, Gemerek is not precluded from bringing his ADA claim in federal court.

### 3.     NYHRL Claims

Gemerek contends that he was discriminated against based on his actual or perceived mental disability and was subject to a hostile work environment, both in violation of the NYHRL. (Pl.'s Memo., pp. 12, 20.)

As discussed above, Defendants argue that the common issue in both cases is the motivation behind BSA's actions against Gemerek. (Defs.' Reply, p. 1.) They cite the same cases, <u>Perry</u> and <u>O'Connor</u>, to support their assertion that it does not matter that Gemerek did not characterize his improper practice charge as a discrimination claim since collateral estoppel bars the relitigation of facts properly determined by the ALJ. (Defs.' Memo, p. 23.)

16

As already noted, the ALJ's discussion was limited to whether Gemerek was terminated in retaliation for his participation in the filing of a charge and grievance. Neither disability discrimination, nor a hostile work environment, were at issue in the PERB hearing. For instance, the only mention of Gemerek's mental condition in the ALJ's decision was that Dr. Joseph found no major mental illness and cleared him to return to work.

Thus, there is no identity of issue as to Gemerek's disability claim or hostile work environment claim under the NYHRL.

### 4.      Labor Law Claims

Defendants argue that the issue of whether BSA retaliated against Gemerek for his involvement in union activity was directly before PERB and, so, his Labor Law claims are precluded. (Defs.' Memo., p. 21.) Gemerek contends that not all elements of his Labor Law claims were before the PERB ALJ and that "a finding that Mr. Gemerek's termination was 'for cause' was not necessary to determine whether the demotion and termination are based on the filing of an improper practice charge and grievance." (Pl.'s Memo. at 22.)

The Court confesses it is flummoxed by Gemerek's argument. Gemereks' Labor Law claims allege that Defendants discriminated and retaliated against him for exercising his union rights as a member of the CSEA. The ALJ concluded that Gemerek had no involvement in the filing of the improper practice charge, and found no evidence of his involvement of the grievance. Accordingly, the question of whether these particular activities were the cause of his termination was necessarily answered. There is identity of issue here.

Gemerek does not claim he was denied his procedural rights during the hearing or

17

PERB review.  The hearing was held over a period of six days.  (Defs.' Ex. B, p.1.)  Both parties, BSA and CSEA, were present and represented.  (Id.)  CSEA's counsel was competent, presenting and cross-examining witnesses, introducing evidence, submitting papers, and making oral argument.  And CSEA had the opportunity to, and did, submit exceptions to the ALJ's determination.  (Defs.' Ex. B.)  Finally, PERB reviewed the determination and affirmed the ALJ's findings.  (Defs.' Ex. C.)

Multiple witnesses were called at the PERB hearings.  Pertinent to this claim, Hazzan, DiPalma, and other BSA employees testified regarding the filing of the improper practice charge in 1995.  (Defs.' Reply. Ex. C.)[6]  Gemerek testified and was cross-examined on his lack of participation in that filing.  (Defs.' Reply, Ex. C.)  For instance, when asked if he appeared at PERB in connection with the improper practice charge, Gemerek responded that he "wasn't involved in any of that."  (Id. 200:18-23.)

The record shows Gemerek had a full and fair opportunity at the administrative proceeding to litigate the question of his involvement in the union activities, and he has failed to demonstrate otherwise.   Thus, Gemerek is collaterally estopped from bringing a labor law claim regarding his  alleged involvement in the improper practice charge.

## B.    Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

---

[6]Referring to exhibits to Defendants' "Reply Declaration of Randolph C. Oppenheimer in Further Support of Defendants' Motion for Summary Judgment."

judgment as a matter of law."  FED. R. CIV. P. 56(c)(2).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."  Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  Summary judgment is proper "only when reasonable minds could not differ as to the import of evidence."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication."  Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted,

19

expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation."  Id.

The Court must now examine the merits of the claims not precluded, in the context of the summary judgment motion.

### 1.    § 1983 Claim

Gemerek argues that Defendants violated his § 1983 rights when they demoted and terminated him in retaliation for engaging in protected speech.

"A section 1983 claim lies where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws." Friedl v. City of New York, 210 F.3d 79, 86-87 (2nd Cir. 2000).  It is well established that the First Amendment prohibits government entities from punishing its employees in retaliation for the content of their public speech.  See, e.g., Waters v. Churchill, 511 U.S. 661, 668, 671-75, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); Rankin v. McPherson, 483 U.S. 378, 383-84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1986); Pickering v. Board of Educ., 391, U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

"A government employee's right to free speech is violated if '(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said his speech was a motivating factor in the determination.'" Velez v. Levy, 401 F.3d 75, 95 (2nd Cir. 2005) (quoting Feingold v. N.Y., 366 F.3d 138, 160 (2nd Cir. 2004) (internal quotation marks omitted)).  Once the plaintiff has demonstrated the existence of these factors, the employer may still avoid liability if it shows it would have

taken the same adverse action even without the protected speech.  Mandell v. Cnty of Suffolk, 316 F.3d 368, 382-83 (2nd Cir. 2003.)

Gemerek contends he engaged in protected speech when he participated in a union demonstration, wrote a letter to the Buffalo Common Council, and wrote a letter to Congressman Jack Quinn.  Defendants argue that because Gemerek's remarks in each instance were personal to him and advanced no public interest, they are not constitutionally protected statements.  (Defs.' Supp. Memo., p. 3.)

As a general rule, speech on "any matter of political, social, or other concerns to the community" is protected by the First Amendment.  Connick v. Myers, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).  However, "when a public employee's speech is focused on personal matters, it is not considered to be a matter of public concern."  Isaac v. City of New York, 701 F.Supp.2d 477, 495 (S.D.N.Y. 2010).  In order to determine whether the speech addresses a matter of public concern, the court must examine the content, form, and context of the plaintiff's statements.  Pickering, 391 U.S. 563 at 571-72.

The parties offer differing accounts of what Gemerek said  to Hazzan and DiPalma during the union protest.  Taking Gemerek's account as true, he stated, 'Hi Pam, Hi Tony. I'm over here.  You want to threaten my family, come on over and do it on camera."  (Pl. Dep. 242:6, 243:4-6.)  While Gemerek testified he remembered others chanting, "one term Tony," referring to then-Mayor Tony Masiello, (Id. 253:11-14), and union jingles, such as "the sewer authority is unfair" (Id. 253:3-6), he did not recall participating in any of those chants.  (Id. 253:15.)

Gemerek's letter to the Common Council, dated July 3, 1996, complained of

21

"ongoing threats, intimidation, harassment by phone, mail, and at [his] personal residence, to [himself] personally and [his] family." (Defs.' Suppl. Ex. P.)[7] He asked that for his sake and others, the Common Council look into the "ongoing legal, labor and financial situations . . . and all sexual, racial and political abuses" at the BSA, but did not elaborate on any of these generalized allegations. (Id.)

Gemerek's comments, when stretched, may touch on matters of public concern, but vague references to other city employees does not turn what are essentially his personal gripes into protected statements. By Gemerek's own testimony, his statements at the demonstration concerned only himself and his family, and were driven by his own personal grievances. His letter to the Common Council, written shortly after his full-time position was eliminated on May 27, 1996 and he was banned from BSA's premises on July 21, 1996, again referred to conduct directed to him and his family. His off-hand and nonspecific reference to helping "others" simply suggests Gemerek wanted to lend weight to his personal grievances; such generalized references are not sufficient to support a finding that he sought to address a matter of public concern. Given the content, form, and context of Gemerek's speech, his statements at the union rally and in the Common Council letter cannot be considered protected speech under the First Amendment. "[T]he mere fact that one or two comments could be construed broadly to implicate matters of public concern does not alter the general nature of [the] statements." Ezekwo v. New York City Health & Hosp. Corp., 940 F.2d 775, 781 (2nd Cir. 1991).

As for Gemerek's letter to Congressman Quinn, dated January 27, 1996,

---

[7] Referring to "Defendants' Supplemental Appendix to Local Rule 56.1."

Defendants argue the letter is misdated and was actually written after his November 8, 1996 termination.  (Defs.' Reply, p.10.)

The substance of the letter indicates that it was written after Gemerek's termination, most likely in January 1997.[8]  Thus, the letter cannot have been the basis of the alleged First Amendment retaliation in November 1996.

Because Gemerek's evidence cannot support a finding that he engaged in constitutionally protected speech and/or that such speech occurred prior to his termination, Defendants' motion for summary judgment is granted as to his § 1983 claim.

## 2.    ADA and NYHRL Discrimination Claims on Basis of Disability

Gemerek alleges he was discriminated against in violation of the ADA and NYHRL on the basis of mental disability or perceived disability when Defendants "threatened, harassed and intimidated him, locked him out of work, required him to undergo a psychiatric examination that was not required of other employees or warranted by business necessity, suspended and ultimately discharged him." (Second Amend. Compl. ¶¶ 56, 62, 84, 97.)

ADA and NYHRL claims are analyzed under the McDonnell Douglas burden-shifting analysis.  Regional Econ. Cmty. Action Program, Inc. v. City of Middletown, 294, F.3d 35, 49 (2nd Cir. 2002); see Arena v. Agip USA Inc., 2000 WL 264312 at * 7 (S.D.N.Y. March 8, 2000).  To succeed on his cause of action alleging disability discrimination, Gemerek must first demonstrate that "(1) his employer is subject to the ADA [or NYHRL]; (2) he was

---

[8]Most notably, the letter states, "I have been locked-out for 7 months, forced to file for unemployment."  (Defs.' Reply, Ex. B.)

disabled within the meaning of the ADA [or NYHRL]; (3) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (4) he suffered adverse employment action because of his disability." Sista v. CDC IXIS North America, Inc., 2005 WL 356973 at *5 (S.D.N.Y. Feb. 15, 2005) (quoting Giordano v. City of New York, 274 F.3d 740, 747 (2nd Cir. 2000)).  Once a plaintiff has established his *prima facie* case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Assuming that the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's discrimination was intentional.  In this regard, the plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

Defendants apparently concede that Gemerek has offered sufficient evidence to establish a *prima facie* case.  However, they urge that summary judgment is warranted because they had legitimate, non-discriminatory reasons for their actions– first, Gemerek's failure to provide a physician's note specifying the nature of his illness was a legitimate reason to place him on disability leave, and second, his threatening behavior toward other employees was a sufficient reason to terminate him.

### a.    *Placement on Disability Leave*

Defendants, relying on Article IX, Section 1(h) of the collective bargaining agreement for the period July 1, 1995 - June 30, 1998, urge that Gemerek's noncompliant doctor's

note justified his placement on disability leave.   Nothing in the record supports the conclusion that Defendants' action was consistent with the CBA or BSA policy.  As noted above, the plain language of this CBA provision requires that the nature of an absentee's illness be provided for the purpose of receiving payment for sick time.  The limited purpose of this provision is noted in Defendants' own letters to Gemerek, one of which states that a failure to provide a note in compliance with the CBA "disqualified [him] from having this absence charged against [his] accumulated sick leave credits" and he would not be paid for the absence.  (Docket No. 119-5 at 14.)  There is no indication such a failure can result in placement on disability leave.

Defendants' policy then in effect for a return to work from an extended illness required only that the returning employee first schedule an appointment with DiPalma and produce written authorization from his or her physician to return to work.  (*Id.* at 30.)  There is no dispute that Gemerek did appear at the scheduled time with a written authorization from a treating physician to return to work on July 14, 1996 with no restrictions.  Thus, Defendants' argument that Dr. Kang's return to work note was "noncompliant" in this regard (Docket No. 120 at 7), is without support in the record.

Defendants have not met their burden of showing that Gemerek's failure to identify the nature of his illness was a legitimate, nondiscriminatory reason for declining to return him to work and, instead, placing him on disability leave.  The fact that DiPalma looked Dr. Kang up in the phone book and found he was a psychiatrist does not alter this result.

        **b.**    ***Gemerek's termination***

According to Defendants, their decision to terminate Gemerek's employment was

based on his confrontational and threatening behavior toward other employees, along with Dr. Joseph's opinion that Gemerek did "not have a major mental illness, as such."[9]  (*Id*. at 10.)  Defendants specifically point to the following: Gemerek's admission that he became loud and angry when he learned DiPalma was not available for the pre-return-to-work meeting she had scheduled with him; and his statements at the labor demonstration, which all BSA employees testified included profanity.  (*Id*. at 8, 11.)  In addition, Defendants point to DiPalma's generalized testimony at the PERB hearing that "employees at the plant . . . were afraid to work with [Gemerek]."  (*Id*. at 12.)  Relying on Sista v. CDA Ixis North America, Defendants urge that they had a legitimate nondiscriminatory basis for terminating Gemerek because he was confrontational and presented a threat to other employees.  02 Civ. 3470, 2005 U.S. Dist. LEXIS 2163 (S.D.N.Y. Feb. 15, 2005), *aff'd,* 445 F.3d 161 (2d Cir. 2006).

In Sista, the employer had policies against employee misconduct and threats in the workplace.  445 F.3d at 171.  Following a demotion, the plaintiff "blew up" and "yelled" during a meeting with the company's human resources director, shouted and cursed in a subsequent meeting with management in which he admittedly "could not control his mounting agitation," and told his direct supervisor that if he had "pulled" more than one of the plaintiff's taped telephone calls "I swear to Christ I'm comin' for you."  *Id*. at 166.  The supervisor immediately exclaimed that the comment was a personal threat and the plaintiff

---

[9] From this statement, Defendants appear to suggest that Gemerek is or was not an individual with a disability.  However, they have not directly challenged his *prima facie* case in this regard, and it also bears noting that Dr. Joseph was not asked to opine on whether Gemerek is an individual with a disability under the ADA or HRL.  Rather, he was asked consider whether Gemerek was then capable of returning to work and safely performing his job.  (Docket No. 119-5, Ex. L.)  Dr. Joseph answered this question in the affirmative, despite Gemerek's documented, long-standing treatment for depression. (*Id*. Ex. M.)

was placed on a leave of absence.  In a meeting two months later, the supervisor informed management that he felt he was in physical danger because of the plaintiff's threat and, after further consideration, the company terminated the plaintiff's employment.  *Id*. at 166-67.  On these undisputed facts, the Second Circuit affirmed the district court's conclusion that the employee's behavior was conduct an employer could legitimately determine was inappropriate and unacceptable in the workplace.  *Id*. at 172.

Defendants contend that, like Sista, Gemerek was placed on a leave of absence after his behavior to other employees grew confrontational and, like Sista, he presented a threat to other employees.

First, Defendants have failed to show that Gemerek's allegedly confrontational conduct was the reason he was placed on a leave of absence.  This statement is contrary to their position in the PERB proceeding and also on this motion.  In both venues, Defendants state it was Gemerek's refusal to comply with the CBA's requirements relative to a physician's note, *prior to* the alleged confrontations, which resulted in his being placed on leave.  (Docket Nos. 85-4 at 44; 120 at 6-10; 136 at 8 ("Gemerek incorrectly suggests that the failure to provide a physician's note was the reason for his termination. . . . [That failure was instead] the legitimate non-discriminatory reason for the Authority's decision to place him on disability leave.")).

Second, Defendants' conclusory statement that Gemerek presented a threat to other employees is not supported on this record.  Defendants  point to the rationale for termination Hazzan and DiPalma gave at the PERB hearing as the basis for Gemerek's termination.  (Docket No. 136 at 8-9.)  But as Gemerek notes, this testimony is conclusory,

27

at best.

Hazzan testified that there "was a series of incidents which we construed as inappropriate and improper." He did not refer to any confrontations or threats. (Docket No. 85-4 at 46.) Similarly, DiPalma's vague testimony regarding unnamed employees being afraid to work with Gemerek was not based on any articulated threatening behavior. Rather, DiPalma stated Gemerek had behaved toward supervisors in some unspecified, "uncooperative" manner that was inconsistent with unspecified rules and regulations, and the unnamed employees felt he was "totally against management." (*Id*. at 47.)

Indeed, when Hazzan wrote to Dr. Joseph that he feared Gemerek "may attempt to resolve his differences with the BSA through physical violence," he identified only one alleged comment by Gemerek, made in the fall of 1995, that involved his personal life only. Gemerek allegedly stated, in DiPalma's presence, that he was going to shoot his ex-wife's boyfriend. DiPalma testified that she did not take this threat seriously and viewed it as just "venting." (DiPalma Dep. 168:18.) After this alleged violent behavior, Gemerek appears to have continued in his position without incident and no concerns were raised or precautions taken in the workplace. Following a very brief layoff due to the restructuring, Gemerek was offered a temporary assistant shift superintendent position in May 1995, despite his allegedly violent tendencies.

Defendants also point to the fact that, in ruling on exceptions to the ALJ's findings, the PERB Board stated that "Gemerek, by his conduct during these allegedly protected activities [*i.e.*, at the labor rally], revealed that he did not have the traits necessary to continue in employment." The Board expressly noted that Gemerek directed vulgarities

28

to Hazzan and DiPalma and Defendants urge this is sufficient to establish their legitimate reason. (*Id*. at 56-57.)    Unlike <u>Sista</u>, however, these obscenities occurred off the clock and outside the workplace.   Defendants have not identified any BSA rule or policy governing conduct outside of work.

Indeed, the only reference in the record that can be construed as a threat toward a BSA employee is Hazzan's testimony that when Gemerek was at the labor rally, he shouted at Hazzan and DiPalma: "I'm going to get you f—heads." (*Id*. at 45.) However, his testimony is contradicted by that of DiPalma and DiBenedetti, and also is inconsistent with his earlier description to Dr. Joseph of Gemerek's statements on that day. (*Id*.; Docket No. 119-5 at 53.)

In sum, Defendants' reliance of <u>Sista</u> is unpersuasive, and on this vague and contradictory record, they have not shown that Gemerek engaged in "confrontational and threatening behavior toward other employees [that] gave the Authority a legitimate, non-discriminatory reason to terminate him." (Docket No. 120 at 10.)

Even were this Court to have found otherwise, the foregoing, along with other evidence in the record, is sufficient for Gemerek to avoid summary judgment on a showing that his perceived or actual disability discrimination was "at least one of the motivating factors" in Defendants' decision. <u>Holcomb v. Iona Coll.</u>, 521 F.2d 130, 138 (2nd Cir. 2008). Dr. Kang cleared Gemerek to return to work without restriction.  Yet, shortly after DiPalma ascertained that Dr. Kang was a psychiatrist, Hazzan notified Gemerek that he was placed "on leave for ordinary disability as of July 14, 1996" due to concerns regarding Gemerek's "present ability to return to [his] regular duties."  Thereafter, Dr. Joseph considered whether

29

Gemerek posed a danger to others, advised Defendants that he found no indication Gemerek had been overtly violent over the years, nor any indication of current violent fantasies, and concluded that Gemerek could return to work.  Upon receiving Dr. Joseph's report, BSA immediately placed Gemerek on a paid leave of absence, and terminated him shortly thereafter.

Because Defendants have not come forward with undisputed evidence of a legitimate, nondiscriminatory reason for termination and because those same questions of fact are sufficient for a showing of pretext, Defendants' motion for summary judgment is denied as to Gemerek's claims of disability discrimination under the ADA and NYHRL.

### 3.    ADA and NYHRL Hostile Work Environment Claims on Basis of Disability

Gemerek alleges he was subjected to a hostile work environment after Defendants were put on notice that he was disabled on November 8, 1995.  (Pl.'s Memo, p. 22.)

Hostile work environment claims under the ADA are evaluated under the same standards as Title VII claims.[10]  Monterroso v. Sullival & Cromwell, LLP, 591 F.Supp.2d 567, 584 (S.D.N.Y. 2008).  To survive a motion for summary judgment, a plaintiff claiming that he was the victim of a hostile work environment must produce evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that

---

[10]NYHRL claims are analyzed under the same standards as ADA claims.  Arena v. Agip USA Inc., 2000 W L 264312 at * 7 (2000).

created the hostile environment to the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999). "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that [he] personally considered the environment hostile, and that the environment rose to some objective level of hostility." Leibovitz v. New York City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001).

It is well settled that "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2nd Cir. 2004).

"Absent extraordinary severity, a plaintiff must show that a 'series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." George v. Liverpool, 2000 WL 1499342 at *6 (N.D.N.Y. Sept. 29, 2000) (citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2nd Cir. 2000). Courts examine various factors to ascertain whether a work environment is sufficiently hostile or abusive to support an ADA claim. These factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Leibovitz, 252 F.3d at 188 (citing Harris, 510 U.S. at 23); Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003). Isolated and occasional instances of harassment do not ordinarily rise to this level. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-271, 121 S.

31

Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam).  The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. . ." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).

 Defendants argue that the incidents Gemerek alleges make up his hostile work environment claim are not enough to establish severe conduct such that a hostile work environment was created.  (Defs.' Supp. Memo., p. 15.)

The discriminatory intimidation Gemerek points to consists of events that allegedly occurred in the workplace from 1995 to 1996.  (Pl.'s Memo., p.22.)  For instance, BSA employees purportedly spread rumors that Gemerek was mentally unstable, spread a rumor that Gemerek had a gun in his locker when he did not even have a locker at work, and broke into his desk and took his personal belongings.  (Id. at 22-23.)

The Court finds that these instances are not severe or pervasive enough such to establish the existence of a hostile work environment.  First, none of Gemerek's alleged incidents, taken alone, were so "extraordinarily severe" as to have altered the conditions of Gemerek's working environment.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).  Conduct must be so severe as to "create an objectively hostile or abusive work environment— an environment that a reasonable person would find hostile or abusive." Harris, 510 U.S. at 21.  Gemerek makes it clear that these incidents negatively affected him, but fails to give evidence to conclude that a reasonable person would find such conduct to be hostile.

Second, Gemerek has not shown that these series of incidents were "sufficiently

continuous and concerted" to have altered the conditions of his working environment. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2nd Cir. 1997) (quoting (Carrero v. N.Y.C. Housing Auth., 890 F.2d 569, 577 (2nd Cir. 1989)) (internal quotation marks omitted.) Looking at the few instances as a whole, they are "too few, too separate in time, and too mild... to create an abusive working environment." Alfano v. Costello, 294 F.3d 365, 380 (2nd Cir. 2002).

Therefore Defendants are entitled to summary judgment on Gemerek's hostile work environment claims under the ADA and NYHRL. Because Gemerek has not established the first element of a *prima facie* case of hostile work environment, this Court need not address the second element. Defendants' motion for summary judgment on Gemerek's hostile work environment claims will be granted.

## IV.  CONCLUSION

For the foregoing reasons, Gemerek is collaterally estopped from asserting his labor law claims with regard to his membership in CSEA and exercise of his union rights, and summary judgment is granted as to his Sixth and Seventh Causes of Action. Likewise, summary judgment is granted as to Gemerek's First (Section 1983/First Amendment) Cause of Action and his Fifth, Eighth, and Ninth Causes of Action (hostile work environent by the BSA in violation of the ADA and NYHRL, and by Hazzan in violation of the NYHRL). Summary judgment is denied as to Gemerek's Second, Third, and Fourth Causes of Action, alleging disability discrimination by the BSA in violation of the ADA and NYHRL, and by Hazzan in violation of the NYHRL.

**V.  ORDERS**

IT HEREBY IS ORDERED, that Defendants' Supplemental Motion for Summary Judgment (Docket No. 119) is GRANTED in part, and DENIED in part.


SO ORDERED.


Dated: July 22, 2011
         Buffalo, New York

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
Chief Judge
United States District Court